**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 95-5796

SALOMON S. LOAYZA,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Raymond A. Jackson, District Judge.
(CR-95-11)

Argued: October 31, 1996

Decided: February 25, 1997

Before WIDENER and HALL, Circuit Judges, and THORNBURG,
United States District Judge for the Western District of
North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Thornburg wrote the majority
opinion, in which Judge Hall joined. Judge Widener wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Oldric Joseph LaBell, Jr., Newport News, Virginia, for
Appellant. Alan Mark Salsbury, Assistant United States Attorney,
Norfolk, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United
States Attorney, Norfolk, Virginia, for Appellee.

_____

**OPINION**

THORNBURG, District Judge:

Appellant, Salomon S. Loayza, assigns numerous errors to the court below in connection with his convictions for mail fraud in violation of 18 U.S.C. § 1341.

Loayza and co-defendant Robert Shirey owned or co-owned and operated several investment management companies. They devised a Ponzi-type scheme whereby individuals were persuaded to invest in these companies by representations that their funds would be invested in reputable mutual funds guaranteed to earn tax-free interest and dividends.**1** The investors were also assured the original principal investment ultimately would be returned in full. The money actually was used to pay the personal and business expenses of appellant and Shirey. Periodically, funds from new "investments" were used to make "interest payments" to the earlier investors. The availability of investment funds was assured by the use of the mail. Eleven investors were defrauded for a total of $628,000.

I.

Appellant's first attack is on the bill of indictment. Prior to trial, he moved to dismiss the indictment as legally insufficient. The trial court denied the motion but ordered the government to file a bill of particulars.

Because appellant moved against the sufficiency of the indictment at trial, this court applies a de novo standard of review. United States v. Darby, 37 F.3d 1059, 1060 (4th Cir. 1994), cert. denied, 115 S. Ct. 1826 (1995). "[H]eightened scrutiny" is applied because the motion attacking the sufficiency was made prior to the verdict. Id., at 1063.

_____

**1** A "Ponzi" scheme typically refers to one in which early investors are paid off with money received from later investors in order to prevent discovery and to encourage additional and larger investments. It is named for the alleged 1920's swindler, Charles A. Ponzi.

2

Appellant attacks the indictment primarily on the ground that the names and addresses of the victims were not included in each count. Counsel conceded at oral argument, however, that appellant was not prejudiced by the omission if the indictment is otherwise sufficient. He also claims it failed to give adequate notice of the charges because, while the counts refer to the amounts of the investment checks sent through the mail, the indictment does not state to whom they were payable, upon what banks drawn, the persons sending the check, the persons to whom sent, and the places of receipt.

In order to be legally sufficient, "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." United States v. Daniels, 973 F.2d 272, 274 (4th Cir. 1992), cert. denied, 506 U.S. 1086 (1993). If the indictment does not contain every essential element of the offense, it is invalid; and, a bill of particulars cannot cure the defect. Darby, 37 F.3d at 1063; United States v. Price, 857 F.2d 234, 236 (4th Cir. 1988) (citing Russell v. United States, 369 U.S. 749 (1962)). In essence, then, the bill of indictment insures that a defendant does not face incarceration "except on presentment or indictment of a grand jury;" thus, if it is insufficient, a prosecutor cannot cure the defects. Darby, supra; United States v. Floresca, 38 F.3d 706 (4th Cir. 1994).

The essential elements of mail fraud are "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme." United States v. United Medical and Surgical Supply Corp., 989 F.2d 1390, 1404 (4th Cir. 1993). The indictment here alleged that from March 1989 through December 1993, the appellant devised a scheme to defraud persons by inducing investments in specified investment management companies which he owned or co-owned. It also alleged intentional fraudulent representations by appellant as to future investments, interest rates, the return of original principal, the diversion of funds, and the cover-up of the scheme by partial "interest" payments. Eleven unidentified investors were alleged to have been defrauded for a total of $628,000. The checks used in the scheme were identified by the amount and as having been received through the mail on specified dates because of

3

appellant's representations. The essential elements of the charge thus are clearly specified.

Moreover, in order to obtain a conviction for mail fraud, the indictment must

> furnish the accused with such a description of the charge against him as well enable him to make his defence .. ".
> [I]ndictments which do not identify specific mail fraud victims by name [are sufficient].

United States v. Mizyed, 927 F.2d 979, 981 (7th Cir.), cert. denied, 500 U.S. 937 (1991) (citations omitted); accord , United States v. Hatch, 926 F.2d 387 (5th Cir.), cert. denied , 500 U.S. 943 (1991) (an indictment for mail fraud is sufficient despite the failure to identify the victim); accord, United States v. Arlen, 947 F.2d 139, 145 (5th Cir. 1991), cert. denied, 503 U.S. 939 (1992) (discussing a violation of 21 U.S.C. § 333) ("[t]he prosecution must prove beyond a reasonable doubt that a defendant intended to defraud or mislead someone, but the indictment need not specify the intended victim; the focus is on defendant's intent, not the victim's identity"). The indictment here was sufficiently specific. The time period, the scheme, the purported investment companies, the "cover-up" of the diversion of funds, and the use of the mail to carry out the scheme are all alleged. Id. The identity of the fraud victims is not an essential element of the crime.

Nonetheless, the appellant is entitled to assurance that the indictment and prosecution were in fact for the same violations. In other words, upon what basis may it be determined that the grand jury returned a bill of indictment charging mail fraud of the same investors used by the prosecution to prove his case. Darby , supra; Floresca, supra.

The indictment's preamble to Count One contains a detailed description of the scheme used by appellant to defraud investors, including the fact that appellant both solicited checks directly from the victims and also induced them to "liquidate their legitimate investment holdings and transfer the funds to the defendant and his companies." J.A. at 13. The indictment also states that eleven investors were defrauded of a total of approximately $628,000. Id., at 14. Count One

4

goes on to allege that on September 11, 1990, appellant received from the mail a check in the amount of $10,000 "which was mailed by an investor." Id. Each of the remaining counts incorporates the preamble text to Count One. Count Two alleges that on April 8, 1992, the appellant received in the mail a check in the amount of $10,000 which had also been mailed by an investor. Id., at 15. Likewise, Count Three specifies the receipt on June 4, 1991, of a check in the amount of $10,000 mailed by an investor. Id., at 15-16. The specification of the dates on which these checks were received by appellant, the amounts thereof, and the mailing thereof by investors assures that the grand jury, in returning charges on these counts, had in mind the investors who ultimately testified against appellant.

Such assurance is also certain as to Counts Four and Five. Those counts as well incorporate the preamble text to Count One. Count Four charges that on December 18, 1991, the appellant caused "to be delivered by mail according to the direction thereon, a check in the amount of $20,000.00, which was mailed by Keystone Fund to an investor solicited on the basis of the false and fraudulent statements and representations described" in the preamble text. J.A. at 16. When read together with paragraph 2 in Count One, it is clear that appellant induced the victim in Count Four to liquidate a legitimate investment in the Keystone Fund in order to place the investment with his companies and that he used the mail to do so. Count Five charges the same conduct, on a different date, involving a check in the amount of $5,000, again mailed by Keystone Fund to an investor for investment with appellant. As noted above, the specification of the dates, the amounts of the checks, and the identification of the legitimate investment company from which the checks were sent assures that the grand jury presented an indictment based on the investors who testified at trial.

While it is possible, as appellant argued, that he received large numbers of checks from various investors, the indictment's identification of the dates, the check amounts and their receipt from investors or investment companies was sufficient to place him on notice of the charges. Appellant,

> understandably, wants the government to disclose its theory of the case and the supporting evidentiary facts."That is not

5

and never has been required at the indictment stage.. . . The ready remedy of a motion for a bill of particulars[under Fed. R. Crim. P. 7(f)] is available to add specifics beyond those required for the indictment to pass constitutional muster. . . ." Here, the indictment "taken as a whole . . . adequately apprised [appellant] of the charges so that [he] might prepare a defense."

Arlen, 947 F.2d at 145 n.7 (citations omitted). Thus, the indictment informed the appellant of the charges and caused double jeopardy to attach for the purposes of any future prosecution. Daniels, 973 F.2d at 274.

It nonetheless bears noting that the addition of the victims' identities could easily have been included in the indictment. Indeed, such a simple addition would have negated the motion to dismiss below and thus, a portion of this appeal.

II.

Appellant next claims the government engaged in prosecutorial misconduct. During closing argument, the prosecutor stated his belief that a certain government witness was telling the truth. J.A. at 290. Defense counsel's contemporaneous objection was overruled. A prosecutor's remarks where an objection has been raised are reviewed in their entirety for harmless error. Fed. R. Crim. P. 52(a). "Any error . . . which does not affect substantial rights shall be disregarded." Id.

Appellant also claims, for the first time on appeal, that other remarks of the prosecutor were improper. Where no objection was raised below, the remarks are reviewed for plain error. Fed. R. Crim. P. 52(b). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Id.

> When the defendant has made a timely objection to an error and Rule 52(a) applies, the court of appeals normally engages in a specific analysis of the district court record-- a so-called "harmless error" inquiry--to determine whether

6

the error was prejudicial. Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.

United States v. Olano, 507 U.S. 725, 734 (1993) (citations omitted). "Stated somewhat differently, had [appellant] preserved this issue for appeal, we would still be called upon to determine whether the government's remarks were prejudicial in resolving whether the remarks constituted reversible error." United States v. Moore, 11 F.3d 475, 481 (4th Cir. 1993), cert. denied, 114 S. Ct. 1864 (1994).

Considering first the prosecutor's remark concerning the veracity of a witness, "[it is] improper for a prosecutor to directly express his opinion as to the veracity of a witness." Moore, 11 F.3d at 481. Moreover, "[a]ny statement of personal belief jeopardizes the integrity of the trial process." United States v. Harrison , 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied, 466 U.S. 972 (1984). Nonetheless, comments made by a prosecutor during closing arguments will not warrant a new trial unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994), cert. denied, 115 S. Ct. 950 (1995). In other words, were the remarks indeed improper and is it more likely than not that the remarks materially affected the appellant's substantial rights. Id.; United States v. Bennett, 984 F.2d 597, 608 (4th Cir.), cert. denied, 508 U.S. 945 (1993) (applying this test where counsel objected to the remarks).

The government concedes the comments here were improper. The issue then is whether those remarks materially affected the verdict. In resolving that issue, we consider first, whether the comments misled the jury and prejudiced the appellant; second, were they isolated or extensive; third, absent the remarks, what was the weight of the evidence against the accused; and fourth, were the prosecutor's remarks deliberate. Moore, 11 F.3d at 482 (citing Olano, supra); see also Bennett, 984 F.2d at 608. The comment here was prejudicial but the trial court's curative instruction prevented it from misleading the jury.[2]

_____

[2] The court charged the jury as follows:

7

Francisco, 35 F.3d at 120 ("[W]e follow the presumption that the jury obeyed the district court's limiting instructions."). The remark was isolated and the evidence against appellant was overwhelming. Moreover, the remark clearly was not intentional since the prosecutor was not aware the word "I" had been used and when so advised, immediately apologized. J.A. at 334-35.

The prosecutor also stated during closing argument that the appellant, who took the stand, was trying to "con" or "dupe" the jury. At another point during defense counsel's summation, the prosecutor said "that's not even close (to the evidence)." Defense counsel failed to object to these comments. Thus, appellant bears the burden of showing plain error; i.e., that the error affected his substantial rights. Olano, supra; United States v. Adam , 70 F.3d 776 (4th Cir. 1995); Mitchell, 1 F.3d at 240.

> To reverse for plain error, we must: (1) identify an error; (2) which is plain; (3) which affects substantial rights; and (4) which "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

Moore, 11 F.3d at 481 (quoting Olano, 507 U.S. at 736).

Under the evidence in this case, the prosecutor's argument that the appellant, on trial for mail fraud, attempted to "con" the jury into believing his version of the events at issue was not plain error. "It is undisputed that closing argument is not merely a time for recitation of uncontroverted facts" and argument may rely on inferences from the evidence. Francisco, 35 F.3d at 120.

_____

> Ladies and gentlemen, I caution you here at this point that during the course of closing argument both counsel perhaps from time to time used the phrase "I believe" or "I think," or this or that in referring to the evidence. That is not evidence. What counsel believes or thinks doesn't matter. It is what you believe and what you find to be the evidence. You are the judges of the facts. So I caution you of that.

J.A. at 334.

8

While it was improper for the prosecutor to make an exclamation during the closing argument of defense counsel, it cannot be said the remark constituted error. It would have been entirely appropriate for the prosecutor to argue during summation that the defense version of the events at issue "were not even close" to the evidence presented. Thus, the remark, while perhaps a breach of courtroom etiquette, was not error.

Moreover, the appellant has not identified the impairment of a substantial right which seriously affected the fairness and integrity of the judicial process. Moore, supra. Thus, the remarks did not constitute prosecutorial misconduct giving rise to reversible error.

III.

Appellant also claims the trial court erred in the admission of evidence pursuant to Federal Rule of Evidence 404(b) in the absence of a notice by the government that such evidence would be presented.[3] Inherent in appellant's claim is a showing that the evidence at issue is indeed Rule 404(b) evidence.

> It is well-settled that decisions regarding the admission and exclusion of evidence are peculiarly within the province of the district court, not to be reversed on appeal absent an abuse of discretion. [A]ny error in [the] admission or exclusion [of evidence] is subject to the harmless error test.

Francisco, 35 F.3d at 118 (citations omitted).

---

[3] Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, . . . of the general nature of any such evidence it intends to introduce at trial.

9

Robert Shirey testified that he and appellant co-owned Provident Capital Management. Irvin Kuhn, an alleged victim, testified that he invested funds with Provident Capital Management in late 1992 and early 1993. J.A. at 76-78, 83-87. Appellant objected to this evidence, claiming that Kuhn actually gave the investments to Shirey who invested them in Provident Capital Management, a company in which appellant had no ownership. In addition, appellant argued the time frame of these investments was outside the scope of the indictment. Thus, appellant claims this testimony amounted to improper use of Rule 404(b) evidence to show a propensity to commit mail fraud.

However, the indictment alleged the scheme continued from March 1989 through December 1993. It also alleged, and the evidence at trial showed, that Loayza and Shirey co-owned Provident Capital Management. The last date in the indictment when appellant was alleged to have used the mail was March 1992. However, his participation in the scheme with Shirey later that year was simply direct evidence of the scheme to defraud, not Rule 404(b) evidence.

> It is well-established, however, that the mere fact that the evidence involved activities occurring [after] the charged time frame of the [offense] does not automatically transform that evidence into "other crimes" evidence. . . . "There is no requirement that all the Government's evidence fall within the time period of the indictment, providing it is relevant to the charges." Rather, evidence of uncharged conduct is not considered "other crimes" evidence if it "arose out of the same . . . series of transactions as the charged offense, . . . or if it is necessary to complete the story of the crime (on) trial."

United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994), cert. denied, 115 S. Ct. 939 (1995) (citations omitted); United States v. Dozie, 27 F.3d 95, 97 (4th Cir. 1994) (evidence concerning fraudulent conduct occurring within the time frame of the conspiracy to defraud admissible to prove involvement in the scheme, not to prove similar acts).

IV.

At trial, the government used summary charts of bank records which were introduced after the testimony of thirteen prosecution wit-

10

nesses occurring over a three day period. Among the 130 government exhibits admitted during this time were the complete bank records of all the companies used by Loayza and Shirey to instigate and perpetuate the fraudulent scheme. Appellant's only argument against the admission of the summary charts is that they "unduly showe[d] the evidence. The jury should be making their judgment from the original records." Appellant's Br. at 29.

The admission of summary charts "will not be overturned on appeal unless [the] decision is shown to be arbitrary or irrational." United States v. Johnson, 54 F.3d 1150, 1156 (4th Cir.), cert. denied, 116 S. Ct. 266 (1995). Summary charts are admissible if they aid the jury in ascertaining the truth. Id., at 1159. The complexity and length of the case as well as the numbers of witnesses and exhibits are considered in making that determination. Id. While the potential prejudice to a defendant must be considered, prejudice may be dispelled by giving the defendant an opportunity to cross-examine the individual who prepared the chart. Id. In addition, a cautionary jury instruction may be requested and given. Id.

The court below applied these factors. It elicited from defense counsel that he had pretrial access to the original documents from which the summary charts were prepared. J.A. at 215. Counsel also had the benefit of the charts themselves prior to trial and an opportunity to cross-examine the testifying agent. Id. ; Johnson, supra.

In addition, the trial court gave the jury a cautionary instruction regarding the use of the charts. Appellant claims this instruction was erroneous because it "invited" the jury to "accept the checks as genuine because they were on the chart." Appellant's Br. at 31. In fact, the trial court laboriously reviewed this instruction with both counsel and included language designed to answer appellant's concern. ("Charts and summaries are only as good as the underlying evidence that supports them." J.A. at 351.) Moreover, counsel accepted and agreed to this instruction. J.A. at 280. Viewing the instruction as a whole, it clearly "informed the jury that the chart represented the Government's analysis, and the jurors must weigh the evidence and determine the witnesses' credibility on their own." Johnson , 54 F.3d at 1161. "Without evidence to the contrary, we follow the presumption that the jury obeyed the limiting instructions." Id.

11

V.

Appellant claims there is insufficient evidence to sustain his convictions of Counts Four and Five because there was no evidence to show he caused the mailings involved in those counts. According to appellant, the evidence failed to show that Mrs. Vaillancourt, one of the victims, told him she had investments in the Keystone Fund. Thus, there was no showing that he knew the mail would be used.

> In reviewing the sufficiency of the evidence to support [appellant's] conviction, this court must view the circumstantial and direct evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir. 1995), cert. denied, 117 S. Ct. 49 (1996).

Mrs. Vaillancourt testified that in 1991 the appellant and Shirey visited her at her home because they wanted her to invest in their company, Salomon Roberts Company. J.A. at 49. As a result, she withdrew money from the Keystone Fund and a check in the amount of $20,000 was made payable to her from that fund and mailed to her. Id., at 51-52. She then endorsed that check to appellant. Id. Appellant claims her testimony failed to establish that he knew the Keystone Fund would use the mail for the transactions.

However, the mail fraud statute does not require such knowledge.

> The question is whether the jury could have reasonably concluded that the mailings were for the purpose of executing the scheme. . . . The mails were "used prior to, and as one step toward, the receipt of the fruits of the fraud." . . . "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended then he `causes' the mails to be used."

12

United States v. Snowden, 770 F.2d 393, 397 (1985) (citations omitted); see also, Schmuck v. United States , 489 U.S. 705, 710-11 (1989) ("It is sufficient for the mailing to be `incident to an essential part of the scheme,' or `a step in [the] plot'"); United States v. Maze, 414 U.S. 395, 400 (1974). A reasonable jury could have found that appellant's solicitation of Mrs. Vaillancourt's investment was done with knowledge that use of the mails would follow in the ordinary course. Thus, the evidence was sufficient to support the convictions in Counts Four and Five.

VI.

Finally, appellant claims the sentencing court committed error in the computation of loss. The circuit reviews " de novo the district court's legal interpretation of the term `loss' under the Sentencing Guidelines, but `to the extent that the determination of the amount of loss is a factual matter, we review only for clear error.'" United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995). Only a preponderance of the evidence need support these factual findings. United States v. Engleman, 916 F.2d 182, 184 (4th Cir. 1990).

In calculating the total amount of loss attributable to appellant, the sentencing court included the "interest" payments made to the early investors. The evidence at trial showed that appellant and Shirey made such periodic payments to dispel investors' complaints and to keep the scheme active. However, the funds used for those payments came from defrauding other investors. Appellant argues the amount of loss attributed to him should have been reduced by these sums which totalled approximately $96,000.

"Loss" is defined as "the value of the property taken, damaged, or destroyed." U.S.S.G. § 2F1.1, comment (n.7) (1994); U.S.S.G. § 2B1.1, comment (n.2) (1994). "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, supra. It does not appear this Circuit has addressed the application of these definitions to the issue at hand. Both parties note the Seventh Circuit has addressed the point in a case involving an almost identical scheme. United States v. Holiusa, 13 F.3d 1043 (7th Cir. 1994). There, the defendant solicited over $11,000,000 for investment in

13

fraudulent companies. Because of complaints from the early investors, over $8,000,000 in payments were returned to them before the scheme was uncovered. The sentencing court charged the defendant with the full amount of $11,000,000; but, on appeal, the Circuit reversed holding that only the "net" loss should be charged. See e.g., United States v. Menichino, 989 F.2d 438, 441-42 (11th Cir. 1992); United States v. Smith, 951 F.2d 1164, 1168 (10th Cir. 1991); United States v. Kopp, 951 F.2d 521, 534-35 (3d Cir. 1991); but see, United States v. Orton, 73 F.3d 331, 334 (11th Cir. 1996) (invoking a case-by-case approach).

The government, however, encourages us to adopt the approach of the dissent in Holiusa which noted that at the time the defendant was engaged in the fraudulent conduct, he clearly intended to receive the full amount. Thus, the definition of "loss" provided in the Guidelines resolves the issue. "This process of partial return was an essential part of [the defendant's] `Ponzi' scheme, and any comparison to a legitimate pledge or security is unfounded." Holiusa, 13 F.3d at 1048-49 (footnote omitted) (Manion, J., dissenting).

The Second Circuit has declined to adopt a "net" loss theory. In dealing with a Ponzi scheme, that court held:

> Under section 2F1.1, loss does not always equal the actual financial harm suffered by the victim. Where the "intended" loss is greater than the "actual loss", intended loss will be used. U.S.S.G. § 2F1.1 Application Note 7. "Under the Guidelines, `loss' includes the value of all property taken, even though all or part of it was returned." Applying these principles, [defendant's] sentence was properly enhanced. Although he returned some of [one victim's] money, and repaid [two other victims], he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for [the first victim's] benefit.

United States v. Mucciante, 21 F.3d 1228, 1238 (2d Cir. 1994), cert. denied, 115 S. Ct. 361 (1994) (citations omitted).

Here, the trial court also found the appellant never intended his victims should ultimately keep the sums paid as "interest".

14

> [T]he defendant, without question, participated in a scheme where a total of $643,575.14 was taken. However, during the course of the preparation of the scheme, around $98,000 was returned to the defrauded investors clearly for the purpose of continuing to defraud them, to perpetrate the scheme. So it was not returned out of any good faith change of mind or any concern about restoring something to the victims, but merely to perpetrate the scheme. . . . It just does not appear to the court that this defendant ought to be able to profit from monies that just happened to be back in the victim's hand while he was perpetrating the scheme because he never had any intent for them to keep the money. It was all designed so that he could continue to steal money from his victims.

J.A. at 404-05. Thus, the sentencing court found the appellant intended the total amount to be defrauded. This approach which holds a defendant responsible for the amount of loss which was intended, not the actual loss ultimately sustained, is appropriate in cases where the payments are vital to the longevity of the scheme. Thus in such factual scenarios, this court will decline to follow the approach of "net loss" and will hold defendants responsible for the value of all property taken, even though all or a part is returned. Where the "intended loss" is greater than the "actual loss," the intended loss should be used.

Finally, in appellant's case, giving him credit for the $96,000 of "interest" payments does not change the calculation of his offense level. Even if the payments are deducted from the total amount defrauded, the loss exceeds $500,000 and a 10-level increase in offense level is warranted. U.S.S.G. § 2F1.1(b)(1)(K).

CONCLUSION

The court has reviewed appellant's other contentions and finds them to be without merit. For the reasons set forth herein, the judgment of the district court is hereby

AFFIRMED.

15

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

While it is true that by the time the courtroom proceedings before the jury commenced Loayza had notice of the acts with which he was charged and that following the trial, a reference to the whole record, including the bill of particulars, would suffice to sustain a plea of former jeopardy in any future trial, it is not true that the Fifth Amendment's requirement, that the indictment show that he was indicted by a grand jury on account of the same acts for which he was tried, was complied with. In that connection, it is plain that the requirement of Rule 7(c)(1) of the Federal Rules of Criminal Procedure, which give effect to the Fifth Amendment to the Constitution, that "[t]he indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged" has been violated, as I will demonstrate.

I.

At trial Loayza moved for the dismissal of all the counts of the indictment (ONE-SIX) for failing to name and describe the investors designated; failing to describe the nature of the misrepresentation made to each of said investors and the date and manner in which it was made; and failing to describe sufficiently the item placed in or taken from the mail. Additionally, he moved to dismiss Counts FOUR, FIVE, and SIX for failure to allege venue within the jurisdiction of the court. The district court denied Loayza's motion, but ordered the government to file a bill of particulars. There is no question on appeal with respect to venue or the nature of misrepresentation made to the investors.

The six-count indictment[1] alleges that Loayza solicited 11 investors and took from them a total of $628,000 pursuant to his fraudulent scheme.

_____

[1] The sixth count, drafted in similar fashion to Counts FOUR and FIVE, was dismissed before trial.

In each of Counts ONE, TWO and THREE,**2** the indictment includes the allegations with respect to the Ponzi scheme and then alleges that Loayza, on a given date,

> did take and receive . . . from the mail, a check in the amount of $10,000, which was mailed by an investor

solicited on the basis of the fraudulent Ponzi scheme. The indictment does not disclose the name of the investor, neither does it otherwise identify the investor. The indictment does not disclose the date of the check; it does not disclose the serial number of the check; it does not disclose the drawer of the check; it does not disclose the bank on which the check was drawn; it does not disclose the payee of the check; it does not disclose the date of mailing of the check; or to whom the check was mailed; where the check was mailed from; neither does it disclose where the check was taken from the mail other than the Eastern District of Virginia.

Counts FOUR and FIVE fare no better.**3** They reallege the Ponzi

_____

**2** Counts ONE, TWO and THREE are identical in their lack of detail, only the date of taking from the mail differs. Typical of these three counts, Count TWO states:

COUNT 2

> THE GRAND JURY CHARGES THAT:

> 1. Paragraphs 1, 2, 3, 4, 5 and 6 of Count One of this indictment [describing the Ponzi scheme] are hereby realleged and incorporated herein by reference as though fully set forth herein.

> 2. On or about April 8, 1991, in the Eastern District of Virginia, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, SALOMON S. LOAYZA did take and receive and cause to be taken and received from the mail, a check in the amount of $10,000.00, which was mailed by an investor solicited on the basis of the false and fraudulent statements and representations described above.

> (In violation of Title 18, United States Code, Section 1341 and Section 2.)

**3** Counts FOUR and FIVE are identical except as to the dates of causing to be delivered and amounts of the checks. Count FOUR provides:

17

scheme and then provide that on a given date in the Eastern District of Virginia, Loayza

> did knowingly cause to be delivered by mail according to the direction thereon, a check in the amount of . . . [$____,] which was mailed by Keystone Fund to an investor

solicited on the basis of the fraudulent representations of the Ponzi scheme.

The indictment does not disclose the bank on which the check was drawn, the date of the check, the number of the check, the drawer of the check, the name of the investor, the date of mailing to the investor, nor does it disclose the date of mailing by the investor at Loayza's direction.[4] The indictment also does not otherwise identify the inves-

_____

COUNT FOUR

> THE GRAND JURY FURTHER CHARGES THAT:

> 1. Paragraphs 1, 2, 3, 4, 5 and 6 of Count One of this indictment [describing the Ponzi scheme] are hereby realleged and incorporated herein by reference as though fully set forth herein.

> 2. On or about December 18, 1991, in the Eastern District of Virginia, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, SALOMON S. LOAYZA did knowingly cause to be delivered by mail according to the direction thereon, a check in the amount of $20,000.00, which was mailed by Keystone Fund to an investor solicited on the basis of the false and fraudulent statements and representations described above.

> (In violation of Title 18, United States Code, Section 1341 and Section 2.)

[4] A fair reading of Counts FOUR and FIVE of the indictment indicates that each count refers to two mailings, one from the Keystone Fund to an investor, and another from the investor to Loayza. After the bill of particulars was filed and proof was taken in the case, it has turned out that the government has depended on only one mailing, from the Keystone Fund to the investor. Who can tell what was presented to the grand jury?

18

tor or which Keystone Fund is involved. Even a rural newspaper lists in its daily financial mutual fund section 12 entries under Keystone, each obviously representing a different mutual fund belonging to a family of funds. See e.g. Bristol Herald Courier/Virginia-Tennessean 7b, Dec. 11, 1996. Without more, one can only assume the indictment refers to the Keystone Management, Inc. company, but of that one cannot be certain.

Keystone Management, Inc. oversees at least 31 different mutual funds that hold some $9.5 billion in assets. Keystone's largest fund contains assets valued at $1.4 billion (Keystone Custodian Funds, Inc. K-1 Series) and even the smallest fund is worth $5.1 million (Keystone America Texas Tax Free Fund). See Investment Company Institute, 1995-1996 Directory of Mutual Funds (1995) (listing individual funds and asset value as of Sept. 10, 1994). As of September 30, 1996, another mutual fund reporter which tracks funds and their different classes listed no less than 67 entries for Keystone with assets totaling approximately $9.6 billion. Johnson's Charts, Quarterly Performance Report 46 (Sept. 30, 1996). In light of these massive holdings the indictment's bald statement that "Keystone Fund" mailed a check does nothing to increase the specificity of the indictment. Which Keystone fund, if any, was the drawer of the check is nowhere disclosed. In fact, the recital of the mailing of the check by one of 31 Keystone funds only serves to underscore the vagueness of these deficient counts. As Loayza argued in his pretrial challenge to the indictment, from the too meager recitals of the indictment it is impossible to identify the checks and transactions involved. One may only guess at how many dozens, hundreds, or thousands, of checks Keystone causes to be delivered by mail on a daily basis in the managing of its multi-billion dollar holdings, either in the specified amounts or any other amount.

This said, Counts FOUR and FIVE also fail to state to whom the checks were payable, upon what banks they were drawn, to whom they were sent, or the places of either mailing or receipt.

II.

Rule 7(c)(1) of the Federal Rules of Criminal procedure requires that every indictment contain "a plain, concise and definite written

19

statement of the essential facts constituting the offense charged." This rule acts to guarantee several constitutional protections, and thus the sufficiency of the indictment may be evaluated according to whether it actually serves each of these functions. In Russell v. United States the Court stated, first, that to ensure the defendant's Sixth Amendment right to know what he is charged with, the indictment must contain the elements of the offense intended to be charged and "sufficiently apprise[ ] the defendant of what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 763-64 (1962). Second, to guarantee a defendant's Fifth Amendment protection against double jeopardy "the record [must] show[ ] with accuracy to what extent he may plead a former acquittal or conviction." 369 U.S. at 764. Double jeopardy protection is not at issue here because, as mentioned above, when the bill of particulars was included and evidence was taken, the record sufficiently identified the specific transactions for which he was convicted to protect him against any subsequent prosecution. Russell, 369 U.S. at 764; see Wright, 1 Federal Practice and Procedure § 125 n.6 (citing Russell ). And Loayza also knew from the indictment he was being charged with mail fraud, but the indictment is far too vague in describing the acts with which Loayza was charged to pass either procedural or constitutional muster.

Central to the deficiency of the instant indictment, is the Fifth Amendment's requirement that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of Grand Jury. . . ." This provides another standard for the sufficiency of an indictment. See 8 Moore, Federal Practice ¶ 7.02 (1996).

The Court in Russell explained that "The very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." Russell, 369 U.S. at 771 (quoting Stirone, 361 U.S. at 218 (1960)). This fundamental protection "is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from the government, or be prompted by partisan passion or private enmity. No person shall be required . . . to answer for any of the higher crimes unless . . . [the grand jury] shall declare . . . that

20

there is good reason for his accusation and trial." <u>Stirone</u>, 361 U.S. at 218 n.3 (quoting <u>Ex parte Bain</u>, 121 U.S. 1, 11 (1887)). The Court has stressed that the indictment must be complete and definite in its charges because

> [t]o allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

<u>Russell</u>, 369 U.S. at 770.

In <u>Stirone v. United States</u>, 361 U.S. 212 (1960), the defendant was charged with one violation of federal law (interference with interstate transport of sand) while at trial proof of another basis for the violation was permitted (interference with interstate steel shipments). The Court reversed the conviction, finding that the defendant's Fifth Amendment rights were abrogated because it was impossible to tell whether the defendant was convicted for the same violations for which he was indicted. <u>Stirone</u>, 361 U.S. at 219. Similarly, even if the record at trial makes clear which transactions the jury considered in convicting Loayza, from the indictment we have no indication of what evidence of which transactions were presented to the grand jury in its decision to indict. The sparse indictment does not specify the serial numbers of the checks involved, the investors involved, the banks on which the checks were drawn, to whom the checks were payable, the dates of the checks, the dates or place of mailing in all of the counts, the date of receipt in Counts FOUR and FIVE, or which one of the 30-odd Keystone funds was the drawer of the check.

Indeed, exhibiting to the grand jury any check in the amount of $10,000, regardless of the date, number, bank, payee or drawer, and whether paid or unpaid, would have satisfied Counts ONE and TWO of the indictment. Almost the same difficulty is present for Counts FOUR and FIVE. For each of those counts, any check ever written in the amounts indicated in the indictment by any of the 30-odd Key-

21

stone funds, regardless of date, number, bank, or payee, upon being presented to the grand jury would have satisfied the vague requirements of the indictment. And it is even doubtful, at best, that such check should have been drawn by any of the Keystone funds because the indictment provides in Counts FOUR and FIVE only that the checks were "mailed by Keystone," not made or drawn by Keystone.

Thus we cannot say "with certainty that . . .[Loayza] was convicted solely on the charge made in the indictment the grand jury returned." Stirone, 361 U.S. at 217.

III.

While the majority opinion does recognize that a bill of particulars cannot cure a defective indictment, it is well to emphasize that the Supreme Court has so held in Russell v. United States, 369 U.S. 749 (1962).

Along the same line, to any extent that the majority opinion, p.3, relies on a lack of prejudice on account of the defective indictment, that reliance is not well taken because we have decided, in United States v. Daniels, 973 F.2d 272, 275 (4th Cir. 1992), that when there has been, as here, ". . . a timely objection to the sufficiency of the indictment, an absence of prejudice is irrelevant." As Daniels points out, our en banc court decided the same question in United States v. Hooker, 841 F.2d 1225 (4th Cir. 1988) (en banc), and United States v. Pupo, 841 F.2d 1235 (4th Cir. 1988) (en banc).

IV.

The majority opinion depends on three cases to support its affirmance. They are: United States v. Mizyed, 927 F.2d 979, cert. denied, 500 U.S. 937 (1991); United States v. Hatch, 926 F.2d 387 (5th Cir.), cert. denied, 500 U.S. 943 (1991); and United States v. Arlen, 947 F.2d 139 (5th Cir. 1991), cert. denied, 503 U.S. 939 (1992).

I suggest, however, that none of them support the conclusion of the majority. Mizyed was a case in which the defendant was convicted of mail fraud in connection with a scheme involving a false redemption

22

of food coupons from food manufacturers and others. The defendant had admitted that he had submitted false information in question-naires sent through the mail, the false information being that J & J Foods, his employer, did accept coupons while, in fact, J & J Foods did not accept coupons. The sole question raised as to the indictment was that the names of the victims of the mail fraud were not identified in the indictment. No other objection was made. The court examined the indictment and found that it "properly detailed the factual circumstances that caused Mizyed to run afoul of the law." 927 F.2d at 981. The other terms of the indictment are not made a part of the opinion, neither are they recited, so we do not know what else it contained, but, since the only objection was the lack of names, that opinion can stand for no more than if such is the sole objection an indictment otherwise sufficiently identifying facts will suffice and the indictment will stand. To use Count FIVE of the case at hand as an example, one of the checks involved was No. 00231838, dated March 27, 1992 and payable to Shirley L. Vaillancourt, in the amount of $5,000, Keystone Series B-4, Account No. 46-1004898042, drawn by Keystone Investor Resource Center [illegible] Disbursement Agent /s/ Ralph L. Spaulding. Had that data, or enough thereof to identify the transaction, been disclosed except the name of Shirley L. Vaillancourt, the description in the indictment of course should be held sufficient, and the mere omission of the name Shirley L. Vaillancourt should not invalidate the indictment. But the govern-ment here, having in its previous possession all of the data with respect to the check, disclosed none of it except its amount.

In United States v. Hatch, a Louisiana sheriff, in legal possession of the general fund for his office, authorized his chief civil deputy to send a check to Hatch in the amount of $25,000, drawn on the general fund. Such check was sent by mail. The $25,000 payment was for ser-vices which Hatch did not actually provide, and the government's contention was that Hatch and the sheriff planned to defraud the gen-eral fund of the money. The indictment alleged a scheme to defraud the Union Parrish Sheriff's Office of the money. Hatch contended that since the general fund was not a separate legal entity from the sher-iff's office, it was impossible to defraud the office. The court decided that naming the sheriff's office as the party defrauded did not prevent Hatch from ascertaining the charges against him. Indeed, the court stated accurately the issue: "[s]ince the UPSO is not a legal entity

23

Hatch claimed that it is impossible to defraud the UPSO [Union Parrish sheriff's office]." 926 F.2d at 391. The only question decided in that case was that it was possible to defraud the sheriff's office, therefore the Hatch opinion should have no effect on our decision at all. The indictment in Hatch omitted or concealed nothing; only the legal effect of the fact disclosed in the indictment was involved.

United States v. Arlen is much like United States v. Hatch. In the Arlen case, the indictment charged that the defendant, with the intent to defraud and mislead, had delivered for introduction into interstate commerce certain prescription drugs without a prescription. The indictment set forth the date of the delivery, the name of the drug, and the recipient of the drug. The statute involved was 21 U.S.C. § 333(b), which required for the degree of the offense charged that the violation be "with the intent to defraud or mislead." The court instructed the jury that if it believed that violation was with the intent to defraud or mislead the government in its regulation of drugs, that was sufficient to satisfy the statute. The court simply held that since the statute did not require any particular person or organization to be defrauded, only that the intent be there, the indictment was sufficient without specifying who must be defrauded.

Again, Arlen, as Hatch is similarly, is only a case of statutory construction having little or nothing to do with identifying the transaction involved. Indeed, a reference to the indictment in n.6 of the Arlen opinion, 947 F.2d at 145, sets out exactly the transaction with which Arlen was charged: the date of the act, the name of the drug, and the recipient of the drug. But the government, here, even with all the information at hand, chose not to identify with any reasonable certainty the acts with which Loayza was charged. Its omission of the name is only a part of the deficiency, and a small part at that.

In this circuit, we have indeed arrived at a like conclusion as in Hatch and Arlen in United States v. Darby, 37 F.3d 1059 (4th Cir. 1994), which involved the construction of a statute involving a threatening communication in violation of 18 U.S.C. § 875(c). Neither Hatch, nor Arlen, nor Darby involved the omission of sufficient factual information to identify the acts with which the defendant was charged,[5] the only decisions in those cases being the construction of a statute or of a term used in the indictment.

_____
[5] The government does not depend on the same authority as does the majority opinion. Rather, it relies solely on United States v. Caldwell,

24

V.

The decisions in this circuit and as well the decisions of other circuits are consistent with the teachings of Russell and Stirone, and have, with considerable uniformity, dismissed indictments which did not state the essential facts constituting the offense charged.

United States v. Hooker, 841 F.2d 1225 (4th Cir. 1988) (en banc), was a RICO prosecution under 18 U.S.C. § 1962(c), which required the enterprise involved be engaged in activities which affect interstate commerce. The indictment omitted the allegation that the activities charged, money laundering by Hooker, had an effect on interstate commerce. The en banc court held that the indictment was deficient not only for failing to state an offense but because it "did not satisfy the Fifth Amendment requirement that all elements of the offense have been considered and found by the grand jury." 841 F.2d at 1230. We rejected arguments that such omission could be cured by a bill of particulars or jury instructions or a reference to the statute.

United States v. Pupo, 841 F.2d 1235 (4th Cir. 1988) (en banc), was a companion case to Hooker. The indictment was for possession with intent to distribute and the distribution of cocaine. The statute required that the distribution be knowingly or intentionally done. Although the indictment referred to the statute, the fact that the distribution was known or intentional was omitted from the indictment, and we held the indictment must be dismissed on that account. We held that "a mere citation to the applicable statute does not give a defendant notice of the nature of the offense." 841 F.2d at 1239.

_____

544 F.2d 691 (4th Cir. 1976). The indictment in Caldwell, however, provided in terms that the defendant, Caldwell by name,"on or about August 14, 1970, knowingly and wilfully placed and caused to be placed in the United States mails an envelope containing a check, said envelope being addressed to `The Greenbrier, White Sulphur Springs, West Virginia, 24986'" for the purpose of executing the scheme to defraud. 544 F.2d at 700. Thus, the Caldwell indictment set out information from which Caldwell could identify the transaction with which he was charged, factual recitals not present here.

25

We followed Hooker and Pupo in United States v. Daniels, 973 F.2d 272 (4th Cir. 1992). Daniels was a case in which the defendant was convicted of possessing and transferring a sawed-off shotgun. The indictment described the shotgun and the transfer in detail but omitted a reference to the code section permitting the transfer. The district court permitted an amendment to the indictment merely to add a reference to the code section. We held that this was in violation of the Fifth Amendment's requirement that a defendant must be prosecuted for a capital or infamous offense only on indictment by a grand jury. Since the indictment on which Daniels was tried did not include the statutory reference, we held the indictment had to be dismissed. Again, we acknowledged that the result was required although Daniels had adequate notice of the charges and received a fair trial.

United States v. Hayes, 775 F.2d 1279 (4th Cir. 1985), was a case of like effect which preceded Hooker, Pupo and Daniels. Hayes was a case under the Travel Act in which 18 U.S.C. § 1952(a) required that the travel be done with intent to carry on or facilitate the promotion of an unlawful activity, the activity in the case being the bribery of a public official in violation of state law. While the requirement of the statute of travel for bribery was plainly set out in the indictment, the indictment did not allege the fact that Hayes had thereafter attempted to perform or performed the violation of state law which he had been charged with traveling to do. We held that was a violation of Fed. R. Crim. P. 7(c)(1) because it did not set forth an essential element of the crime being charged.

Other circuits have come to the same conclusion. United States v. Tomasetta, 429 F.2d 978 (1st Cir. 1970), was a prosecution for loan sharking under 18 U.S.C. § 894 in which the defendant was charged in the indictment that on a given date at Worcester he did "participate in the use of extortionate means . . . namely an express and implicit threat of use of violence to cause harm to the person or certain persons to collect or attempt to collect extensions of credit." The court held that indictment to be invalid under Rule 7(c) because, unless the defendant could demonstrate he was not in the City of Worcester during the entire day in question, he could not have provided an alibi because the precise time and place were not specified in the indictment, p. 980; because of the failure to specify the means by which the alleged threats were communicated, p. 980; and because of the failure

26

to name the victim, p. 980. The court described the indictment as accusing the defendant "of making threats by an unstated means to an unnamed person on a particular day in a city of moderate size," p. 979. The court stressed that no one factor was determinative, but when taken together, they made it unfair to require the defendant to answer the charge. The indictment in Tomasetta is little different from the indictment at hand. The victim in neither indictment is named. While use of the mail is alleged in the indictment in this case, precise or even reasonably certain dates of mailing are not disclosed. Neither are any details with respect to the checks disclosed. All of this information was in the hands of the government and I suggest it is at least as unfair to require Loayza to answer the indictment in this case as the First Circuit held it was unfair for Tomasetta to answer in that case.

This quotation from the Tomasetta court is just as applicable here:

> On an indictment as vague as that at bar, it is possible, however unlikely, for a prosecutor to obtain a conviction based wholly on evidence of an incident completely divorced from that upon which the grand jury based its indictment. The prosecution may not have the power to "roam at large" in this fashion.

Tomasetta, 429 F.2d at 980 (citing Russell v. United States, 369 U.S. 749, 768-771 (1962)).

In United States v. Cecil, 608 F.2d 1294 (9th Cir. 1979), an indictment which gave the period of the conspiracy and named the conspirators in a charge of conspiring to distribute marijuana gave no other facts. The court required the dismissal of the indictment stating "our decision is based upon the absence of any factual particularity within the indictment." In Cecil, as here, the trial court had recognized the short-coming of the indictment and required a bill of particulars, which the court of appeals held could not save the invalid indictment.

United States v. Curtis, 506 F.2d 985 (10th Cir. 1974), was a mail fraud case involving a Computer Matching Institute, in which the defendant's scheme to defraud was based on a false representation that he could match by computer people looking for dates or mar-

27

riages, when in fact he could not. The court required the dismissal of the indictment because the unlawful scheme or plan was "masked, if not concealed, by the conclusionary language of the indictment as framed." p. 987. The court stated on p. 989 that "for all the indictment shows, the grand jury may have had a concept of the scheme essentially different from that relied upon by the government before the trial jury." That same defect is present in the case at hand, among other reasons, because of the vagueness of the indictment with respect to the names of the investors and any even minor detail with respect to the checks.

In United States v. Nance, 533 F.2d 699 (D.C. Cir. 1976), the court required dismissal of an indictment which had charged the obtaining of something of value by false pretenses with intent to defraud in violation of D.C. Code § 22-1301(a). While the indictment stated the name of the victim, the date of the false representation and the amounts involved, it did not state what was the false representation, describing the same only as "the false representations" (italics in original). The reason the court required the dismissal of the indictment was that the United States Attorney would have a free hand to insert the vital part of the indictment without reference to the Grand Jury, p. 701. That same condition pertains here with respect to the unnamed investors and inadequately described checks.

VI.

From the discussion set forth above, it follows that I would require the indictment to be dismissed without prejudice to reindict Loayza.

I would not even find it necessary to decide the constitutional question but would require the dismissal because the indictment is in violation of Fed. R. Crim. P. 7(c)(1). Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 341, 347 (1936) (Justice Brandeis, concurring). Even if the key parts of the indictment are concise in that they are terse, it is neither plain nor definite nor does it contain the essential facts constituting the offense charged as required by that rule.

If somehow or other a dependence on Rule 7(c) were not in order, I would have no hesitation in holding the indictment invalid under the grand jury requirement of the Fifth Amendment because the indict-

28

ment does not sufficiently identify the acts with which Loayza was charged and it follows that there is no way to tell from the indictment whether Loayza was convicted of the same acts for which he was indicted by the grand jury.

29