**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles J. MOORE, Defendant–Appellant.**

**No. 93–5130.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 28, 1993.

Decided Dec. 10, 1993.

---

Matthew Anthony Rizzo, Nikelsberg & Rizzo, P.C., Fairfax, VA, argued, for defendant-appellant.

Michael Edward Rich, Asst. U.S. Atty., Alexandria, VA, argued (Kenneth E. Melson, U.S. Atty., on brief), for plaintiff-appellee.

Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

HAMILTON, Circuit Judge:

Defendant/appellant Charles Moore (Moore) appeals his conviction for conspiracy to possess with intent to distribute and distribute cocaine base (crack), 21 U.S.C. §§ 841(a)(1) and 846. Finding no reversible error, we affirm.

### I

Beginning on January 30, 1992, Detective Chester Lee Toney (Toney) of the Fairfax County Police, while acting in an undercover capacity, purchased crack on numerous occasions from the brother of the defendant, Kirk Moore (Kirk).[1] On the first occasion, Toney met Kirk at an unspecified location and Kirk later paged Moore. When Moore did not return the page, Toney drove Kirk to a residence (Moore residence) that Kirk shared with Moore and their mother. Upon arriving at the Moore residence, Toney and Kirk waited in the ground-floor living room for Moore. Some fifteen to twenty minutes later, Moore arrived and immediately went upstairs, followed by Kirk. After about three or four minutes, Kirk descended down the stairs to the living room with four individually wrapped packets of crack, for which Toney paid about $300.

On February 7, 1992, looking to purchase one-half ounce of crack, Toney contacted Kirk. However, Kirk informed Toney that he would not be able to do anything until Monday [February 10] because his brother was out of town on a basketball trip and the crack was locked up in his brother's safe.[2]

On February 10, 1992, the second transaction occurred at the Moore residence. Similar to the January 30 transaction, Toney met with Kirk elsewhere and drove him home. When they arrived, he gave Kirk $600, Kirk exited the vehicle, entered the residence, and returned after about five or ten minutes with two individually wrapped quarter ounces of crack.

On February 19, 1992, Toney and Kirk negotiated a third purchase for an ounce of crack for $1,200. On this occasion, Toney drove to the Moore residence, where he met Kirk standing outside. Kirk entered Toney's vehicle, got $1,200 from him, exited, entered his residence, returned five to ten minutes later, and handed Toney four individually wrapped quarter-ounce packages containing crack.

On February 27, 1992, a fourth sale was negotiated between the two, this time for two ounces of crack. Then, on March 5, Toney called the Moore residence from his car phone and handed the phone to a person who was accompanying him. Toney heard his companion ask over the phone "Jay, where is Spike ... [?]" (J.A. 87). Apparently, receiving a reply, he hung up the phone and told Toney that Kirk was waiting outside for them. When they arrived at the Moore residence, Kirk was again waiting for them outside. He waved them in, and once inside, Kirk picked up a Crown Royal whiskey bag, reached in and pulled out five individually wrapped packets of crack and handed them to Toney in return for $1,500.

Finally, Toney tried to negotiate a one-eighth kilogram deal with Kirk. On June 8, 1992, in connection with those negotiations, Kirk asked Toney to loan him some money. He told Toney that Moore had not given him any money for the deals that he had done with Toney, and that, as a consequence, he was behind on his child support and had even considered robbing his brother. The sale was never finalized.

As a result of these transactions, both Moore and Kirk were arrested. After obtaining a warrant, the police conducted a search of the Moore residence. That search revealed a safe in Moore's bedroom closet which contained a broken scale, $1,540 in cash, and empty plastic bags. Inside the closet, the investigators also discovered a carrying case containing a Glock nine-millimeter handgun.

---

1. Kirk went by the nickname "Spike." Moore was known as "Jay." Toney, while acting in an undercover capacity, was known to Kirk as "CJ."

2. At that time, Moore played collegiate basketball for Northern Virginia Community College.

On August 11, 1992, a grand jury sitting in the Eastern District of Virginia returned a two-count indictment against Moore and his brother. Count I of the indictment charged both defendants with conspiracy to possess with intent to distribute and distribute more than fifty grams of crack in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged Moore with using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). On October 20, 1992, the district court granted Moore's motion for severance and Moore's case went to trial.

During the government's case in chief, Toney testified about the drug buys from Kirk. The government also introduced the evidence seized in Moore's bedroom during the search of the Moore residence. During the government's examination of Kirk, he denied that Moore was in any way involved in the transactions in question. To impeach this testimony, the government called Investigator Steven Shillingford of the Fairfax County Police. Shillingford testified that he questioned Kirk on the night of his arrest. According to Shillingford, after Kirk admitted having sold crack to Toney, Shillingford asked him who was his source of supply. Kirk identified Moore as his source of supply. Kirk also admitted that: (1) he could never deal with Toney unless his brother knew it; (2) he received the crack from his brother; (3) his brother did not want to deal with other people hand-to-hand; and (4) after consummating a drug transaction, he would take the proceeds back to his brother.

During Moore's defense, Moore attempted to establish that, while he had engaged in drug transactions prior to the fall of 1991, he ceased all drug involvement in September 1991, a time period predating the incidents detailed in the indictment.[3] To support this theory, Moore's defense intended to call William Stewart as a witness. Stewart apparently would have corroborated this theory.[4] At the time of the trial, Stewart was also participating in the Witness Protection Program sponsored by the Drug Enforcement Administration (DEA) and was assisting that agency with its investigation into drug related murders in the District of Columbia. Because of his involvement with the DEA, federal agents kept close supervision over Stewart, transporting him to and from the courthouse on the date of his scheduled testimony.

Although Stewart had apparently agreed to testify on behalf of Moore on the evening before trial, Stewart invoked his Fifth Amendment privilege against self-incrimination and refused to answer defense counsel's questions when called to testify at trial.[5] Because Stewart had been under constant government supervision and had suddenly invoked his Fifth Amendment rights, Moore expressed concern that the government had pressured Stewart into refusing to testify. In response, the district court conducted a brief voir dire of Stewart, asking him whether anyone had suggested that he should refuse to testify. Stewart denied any external pressure to invoke his Fifth Amendment rights.[6]

On October 22, 1992, the jury returned verdicts against Moore of guilty as to Count I and not guilty as to Count II. Thereafter, Charles Moore filed a motion requesting the district court to set aside the verdict of the

---

3. The indictment charged Moore with conspiring to distribute crack between January 1992 and June 1992.

4. Stewart apparently supplied Moore with crack prior to the dates covered by the indictment. According to Moore, Stewart ceased dealing crack and had persuaded Moore to do the same prior to January 1992.

5. The day before trial, the Assistant United States Attorney prosecuting the case informed the district court that he believed Stewart was going to take the Fifth Amendment if called to testify.

6. Specifically, Stewart and the district court engaged in the following colloquy:

> The Court: Has anyone associated in any way with the government directed or instructed or suggested to you that you should invoke your Fifth Amendment privilege in testifying in this case?
> Stewart: No, they didn't.
> The Court: Are you doing that entirely on your own?
> Stewart: Yes.
> The Court: And nobody from the government has suggested to you or told you to do it?
> Stewart: Nobody has suggested.

(J.A. 271).

jury and to order a new trial. In support, Moore claimed that the government pressured William Stewart into refusing to testify. The district court denied this motion. However, at sentencing, Moore again raised his concerns about governmental tampering. Without specifying any basis other than his own allegation, Moore claimed that after the trial, Stewart had informed him that the government had actually pressured him into refusing to testify. In response, the district court requested the Assistant United States Attorney to investigate into the possibility of governmental tampering. The district court also requested the Assistant United States Attorney to file a written report summarizing his conclusions from this investigation. The district court then sentenced Moore to 210 months' imprisonment, but later reduced that sentence to 121 months.

On January 28, 1993, the Assistant United States Attorney provided the district court with the details of his investigation into possible governmental tampering. In this letter, the Assistant United States Attorney discussed his interviews with the DEA agents who had driven Stewart to and from the courthouse on the day he was to testify at Moore's trial. In the letter, the Assistant United States Attorney concluded that he could not uncover any evidence of governmental tampering.[7] In response, the district court mailed a letter to both parties on February 1, 1993. In its letter, the district court opined:

> It appears [the government's] inquiry concerning William Stewart adequately lays to rest any concerns the court had concerning defendant's counsel's access to Mr. Stewart and Mr. Stewart's decision to invoke his constitutional right to remain silent.

(Supplemental Appendix 4).

Moore appeals.

## II

■ Initially, Moore contends that the government interfered with his witness, William Stewart, by pressuring him to invoke his Fifth Amendment rights. Moore's argument rests on implication rather than on direct evidence of tampering. Moore directs our attention to the fact that on the night preceding his scheduled testimony in court, Stewart confirmed his willingness to testify on Moore's behalf; however, on the next day, Stewart invoked his Fifth Amendment rights, and refused to respond to Moore's questions. According to Moore, this sudden change, coupled with the DEA's close supervision over Stewart, suggests that the government pressured Stewart into invoking his Fifth Amendment rights. Because of this purported governmental tampering, Moore claims the district court should have ordered a new trial to preserve his right to a fair trial. We disagree.

■ A criminal defendant's due process rights are violated if governmental intimidation of a witness amounts to "substantial government interference with a defense witnesses' free and unhampered choice to testify." *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). The record in this case does not demonstrate that the government caused improper, let alone substantial, interference with Stewart.

After Stewart invoked his Fifth Amendment rights, the district court questioned Stewart about any pressure from the government. Stewart replied that the decision to invoke his Fifth Amendment rights was entirely of his own free will. *See supra* note 6. In addition, at sentencing, the district court requested the Assistant United States Attorney prosecuting the case to investigate the possibility of any governmental tampering. After conducting such an investigation, the Assistant United States Attorney notified the district court that no tampering had been uncovered. The district court concluded from the government's explanation that no governmental tampering occurred. Such a conclusion is a factual one, subject to a clearly erroneous standard of review. *United States v. Little*, 753 F.2d 1420, 1439 (9th Cir.1984). In short, under the circumstances, we cannot conclude that the govern-

---

**7.** The Assistant United States Attorney never interviewed Stewart.

ment's actions amounted to substantial interference in violation of due process.

## III

Moore next argues that the government failed to produce sufficient evidence to establish his participation in a conspiracy to distribute crack. Moore reasons:

Not a single reliable witness testified that they observed [Charles] Moore deal drugs, set up "buys" or otherwise engage in any activity consistent with dealing narcotics. The facts and circumstances of the case do not demonstrate that [Charles] Moore acted in concert with [Kirk] Moore or with anyone else to achieve "an illegal goal" as is required in order to properly prove the existence of a conspiracy.

Appellant's Brief at 26–27.

The sufficiency of the evidence question raised here is reviewed "under the familiar standard of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which inquires whether 'any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt,' and requires us in applying the standard to construe the evidence in the light most favorable to the government. . . ." *United States v. Giunta,* 925 F.2d 758, 764 (4th Cir.1991).

The essential elements of the crime of conspiracy are well established. The government must prove: "(1) an agreement between two or more persons (who are not government agents), (2) to commit in concert an unlawful act." *Id.* In a drug conspiracy case such as this, the government need not prove the commission of an overt act in furtherance of the conspiracy. *United States v. Mabry,* 953 F.2d 127, 130 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). The government may prove its case by circumstantial, as well as direct, evidence. *Giunta,* 925 F.2d at 764; *United States v. Brown,* 856 F.2d 710, 711–12 (4th Cir.1988). "Because conspiracy requires

agreement between at least two persons to take concerted action, if the purposes of the alleged co-conspirators are different, though both aimed at unlawful goals, there is no conspiracy." *Giunta,* 925 F.2d at 764.

The evidence in this case amply demonstrated that Moore participated in a conspiracy to distribute crack. Specifically, Toney testified that when arranging a drug buy with Kirk, Kirk first paged Moore and, receiving no response, went to the residence that Kirk shared with Moore. There, according to Toney, they waited for approximately twenty minutes, whereupon Moore arrived. Kirk followed Moore upstairs and returned a few minutes later with the crack. A later search of Moore's bedroom revealed drug trafficking paraphernalia. Moreover, Toney testified that Kirk complained to him that Moore had not paid him for the sales that he had made on his behalf. This evidence clearly supports the conclusion that Kirk and Moore conspired to distribute crack.

## IV

Moore's final and most salient argument is that the government's reference to him and Kirk as liars constituted reversible error. During closing arguments, the government made the following comments:

This is a tragic case [featuring] . . . Kirk Moore, a pathetic individual. . . .

And it's compounded when a young man like Kirk Moore comes into a federal court, takes an oath on the [B]ible, and lies. And it is compounded when the defendant, Charles J. Moore, comes into a federal court, takes the oath on the [B]ible, and lies. . . .

[A]s you recall the testimony of the various law enforcement officers . . . ask yourself whether Investigator Toney, Investigator Shillingford, Special Agent McCormick . . . ask yourself whether they, that is trained and experienced police officers, knew whereof they spoke. Ask yourself whether they had some reason to fabricate this. . . .

But what the government knows and what you ladies and gentlemen know is that [Kirk Moore] lied when he took the stand.

(J.A. 440–46). Because defense counsel failed to object to the government's closing argument, and therefore, forfeited the objection, we review the government's closing argument for plain error. Fed.R.Crim.P. 52(b).[8] To reverse for plain error, we must: (1) identify an error; (2) which is plain; (3) which affects substantial rights; and (4) which "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, —— U.S. ——, —— – ——, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

We have recognized that it is highly improper for the government to refer to a defense witness as a liar. *United States v. Cooper*, 827 F.2d 991, 995 (4th Cir.1987) ("[W]e agree with Cooper that the prosecutor engaged in an improper excess of advocacy when he called defense witnesses 'liars.' "); *see also United States v. Moore*, 710 F.2d 157, 159 (4th Cir.) (improper for a prosecutor to directly express his "opinion as to the veracity of a witness"), *cert. denied*, 464 U.S. 862, 104 S.Ct. 192, 78 L.Ed.2d 169 (1983). Not only was the comment in this case improper and unnecessary in light of the overwhelming strength of the government's case, but it also skirts the precipice of reversible error. We have continually admonished the government not to engage in such conduct. Consequently, Moore has established that the government's reference to him and Kirk as liars was error and was plain. Fortunately for the government, we believe that Moore has failed to establish that his substantial rights were affected.

 Moore bears the burden of demonstrating that the government's remarks affected his substantial rights. *Olano*, —— U.S. at ——, 113 S.Ct. at 1778 ("When the defendant has made a timely objection to an error and Rule 52(a) applies, the Court of Appeals normally engages in a specific analysis of the District Court record—a so called 'harmless error' inquiry—to determine whether the error was prejudicial. Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.") The Court in *Olano* concluded that "[n]ormally, although not perhaps in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Id.* In reaching this conclusion, the Court observed that there may "be a special category of forfeited errors that can be corrected regardless of their effect on the outcome" and "errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Id.* The Court characterized prejudicial errors as those that affect the outcome of the trial. *Id.* In this case, we believe that the error complained of—namely, the government's reference to Moore and Kirk as liars—is of the genre that requires Moore to establish prejudice, *i.e.*, that the error affected the outcome of the trial, in order to establish the "affecting the substantial rights" prong of the Rule 52(b) analysis. We reach this conclusion on the common sense recognition that the error in this case is not one which " 'affect[s] substantial rights' independent of its prejudicial impact." *Id.* —— U.S. at ——, 113 S.Ct. at 1779. Stated somewhat differently, had Moore preserved this issue for appeal, we would still be called upon to determine whether the government's remarks were prejudicial in resolving whether the remarks constituted reversible error. *See United States v. Bennett*, 984 F.2d 597, 603 (4th Cir.1993) (in order for prosecutor's comments to constitute reversible error, the comments must have been improper and prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial). Therefore,

---

8. Fed.R.Crim.P. 52(b) provides:

 (b) **Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

it makes little sense in this context to presume prejudice.

We believe Moore has failed to establish that the error in this case affected his substantial rights, *i.e.,* affected the outcome of the trial. First, while it is true the government's comments were improper and indicative of a shoddy and somewhat paltry closing argument, it does not appear that the government's closing had any potential to mislead the jury. Because the government and Moore presented conflicting testimony regarding Moore's involvement in Kirk's crack sales, the jury obviously recognized someone was lying. Second, the challenged remarks were isolated, occurring only once. Third, there was overwhelming evidence of guilt in this case. Consequently, the challenged statements added little to the government's case. Fourth, it does not appear that the government made these statements to distract or mislead the jury. As mentioned, because the evidence presented was conflicting, the jury must have realized that some witnesses had lied. Thus, even though the government acted improperly, the remarks did not affect the outcome of Moore's trial.[9]

## V

Though we find error in this case, it was not reversible. Accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*

---

9. In light of the our decision, we need not address whether the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano,* —— U.S. at ——, 113 S.Ct. at 1779. But once *again*—hopefully for the last time—the government is strongly admonished to "clean up its act."