Filed: December 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

Nos. 98-4776(L)
(CR-98-153-A)

————————

United States of America,

Plaintiff - Appellee,

versus

Jose Luis Hernandez, etc., et al,

Defendants - Appellants.

————————

O R D E R

————————

The court amends its opinion filed November 1, 1999, as follows:

On page 22 -- the second full paragraph is deleted, and is replaced with the following:

> Recognizing, however, that certain costs associated with performing the contract might properly have been passed along to the Army, we remand for the district court to determine the amount of loss in light of this opinion. During resentencing, of course, the government bears the burden of proving the amount of loss by the preponderance of the evidence. See United States v. Davis, 184 F.3d 366, 368 (4th Cir. 1999).

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOSE LUIS HERNANDEZ, a/k/a Luis
Hernandez; COMPUTER SYSTEMS
DEVELOPMENT CORPORATION,
Defendants-Appellants.

No. 98-4776

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ARASELIA HERNANDEZ, a/k/a Ary
Hernandez,
Defendant-Appellant.

No. 98-4777

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

JOSE LUIS HERNANDEZ, a/k/a Luis

Hernandez; COMPUTER SYSTEMS
DEVELOPMENT CORPORATION;
ARASELIA HERNANDEZ,
Defendants-Appellees.

No. 98-4856

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CR-98-153-A)

Argued: June 11, 1999

Decided: November 1, 1999

Before MURNAGHAN and TRAXLER, Circuit Judges,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Nathan Z. Dershowitz, Amy Adelson, DERSHOWITZ &
EIGER, P.C., New York, New York, for Appellants. Major Mark Tel-
litocci, Special Assistant United States Attorney, Thomas Higgins
McQuillan, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Victoria B. Eiger, DERSHOWITZ & EIGER, P.C., New
York, New York; Frank W. Dunham, Jr., Michael S. Nachmanoff,
COHEN, GETTINGS & DUNHAM, P.C., Arlington, Virginia; R.
Kenly Webster, SHAW, PITTMAN, POTTS & TROWBRIDGE,
Washington, D.C., for Appellants. Helen F. Fahey, United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alex-
andria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Defendants Computer Systems Development Corporation
("CSDC") and two of its principals, Jose Luis Hernandez ("Luis") and

2

Araselia Hernandez ("Ary"), appeal their convictions for conspiracy to defraud the United States and to commit various offenses against the United States, see 18 U.S.C.A. § 371 (West 1966 & Supp. 1999), major fraud against the United States, see 18 U.S.C.A. § 1031 (West Supp. 1999), and obstruction of a proceeding pending before an agency of the United States, see 18 U.S.C.A.§ 1505 (West 1984 & Supp. 1999). We affirm the convictions and reject Ary's challenge to her sentence. We agree, however, with the government, which cross-appeals, that the district court improperly determined the amount of loss sustained by the Army under the United States Sentencing Guidelines Manual ("U.S.S.G.") § 2F1.1(b)(1) (1997). Accordingly, we remand for resentencing in light of this opinion.

I.

This appeal arises from a contract for workplace automation and telecommunications services between CSDC and the United States Army Communications-Electronics Command (the "Army"). In June 1998, the government filed a 39-count superseding indictment in the district court naming Luis, Ary, and CSDC as defendants, as well as Luis's brother Jose Jesus Hernandez ("Jesse"). Count one alleged that the defendants engaged in a conspiracy to defraud the United States and to commit various offenses against the United States in violation of 18 U.S.C.A. § 371. Counts 2 through 37 alleged that the defendants committed individual acts of major fraud against the United States in violation of 18 U.S.C.A. § 1031. Count 38 charged that the defendants obstructed the Inspector General's investigation of CSDC in violation of 18 U.S.C.A. § 1505, and Count 39 charged that Jesse tampered with a witness in violation of 18 U.S.C.A.§ 1512(b)(2) (West Supp. 1999).**1** Following a jury trial, Luis, Ary, and CSDC were convicted on all counts of the superseding indictment against them. The district court subsequently sentenced Luis and Ary to imprisonment for a 27-month term and a 21-month term, respectively.

Viewed in a light most favorable to the government, the facts are these. The Army Communications-Electronics Command researches,

_____

**1** Jesse entered a plea of guilty on the § 1505 charge contained in Count 38 and the government dismissed the remaining counts against him. Accordingly, Jesse is not a party to the present appeal.

tests, and develops technology designed to promote electronic warfare, superior communications, and intelligence capability. In September 1993, the Army awarded CSDC a time-and-materials contract for workplace automation and telecommunications services (the "Contract") to be performed at Fort Monmouth, New Jersey ("Fort Monmouth").

At the time, Luis was the President and sole owner of CSDC. Ary, Luis's wife, served as CSDC's Chief Financial Officer, and in that capacity oversaw administration and finance. Jesse, Luis's brother, served as its Director of Purchasing. Jesse later became Vice-President and General Manager of Comtel, a subsidiary of CSDC that would eventually be used to purchase materials in connection with the Contract.

Time-and-materials contracts awarded by the Army are signed and administered by a Contracting Officer employed by the Army, who receives assistance from Contracting Officer's Representatives and Contracting Officer's Technical Representatives. Joseph Brady ("Brady"), the Contracting Officer with respect to the Contract, testified that a time-and-materials contract is one in which a private contractor is compensated for labor based upon fixed hourly rates and reimbursed for the materials required to perform the work based upon the cost of acquisition. With respect to materials, a private contractor's cost of acquisition normally consists of the price paid to a supplier to procure the materials plus a fixed percentage to cover the contractor's general and administrative ("G&A") expenses. Consistent with this framework, Barry Bendel ("Bendel"), CSDC's Vice-President of Operations during the term of the Contract, testified at trial that his understanding was that CSDC would be reimbursed on materials purchased in connection with the Contract "for their cost of the materials plus their G&A burden." J.A. 93. The G&A rate applicable to the Contract was ten percent.

CSDC was expressly obligated under the Contract to purchase materials at the most advantageous price to the Army and to solicit bids from multiple suppliers prior to acquisition. Specifically, the Contract provided that "[i]n obtaining equipment and software, [CSDC] shall ensure that the most cost effective method of acquisition is used and that any and all discounts available to [CSDC] are

4

taken." J.A. 859. The Contract directed that CSDC "solicit multiple vendors through telephone conversations, fax, face to face communications, etc., to determine the best price for delivery within the allotted time frame." J.A. 859.

When the Army required materials in connection with the Contract, Brady, the Contracting Officer, would provide CSDC with a statement of work setting forth the requirements. After receiving the statement of work, CSDC would develop a Task Execution Plan, listing the required materials with corresponding estimated costs. If the estimated costs were reasonable, the Army would approve the Task Execution Plan. The estimated costs, however, were not necessarily the costs that the Army agreed to pay. Rather, an estimated cost was "kind of a ceiling," J.A. 86, requiring CSDC to obtain the Army's approval prior to purchasing materials at a cost exceeding the estimate. Moreover, CSDC Vice-President Bendel testified that CSDC could not charge the Army an estimated cost "[b]ecause that, first of all, that was a ceiling. Second of all, the idea was. . . what you charged the Government for was what you paid, plus your burden rate." J.A. 99.

After the Task Execution Plan was approved, the Army would issue CSDC a delivery order. In response, CSDC prepared an internal form known as a purchase request, which provided descriptions of the required materials, the desired quantities, and the estimated costs. Norm Kelly ("Kelly"), who served as CSDC's Manager of Contracts and later succeeded Jesse as Director of Purchasing, explained at trial that CSDC would use the purchase requests to solicit bids from "three different vendors to get the best value to the Government." J.A. 124. Laura Bakken ("Bakken"), who served under Kelly as Purchasing Coordinator, elaborated on the process employed in obtaining those bids. Bakken would photocopy a purchase request only after folding over or covering up the estimated costs, and then she would send the photocopy of the purchase request to suppliers. When asked at trial why she sent the suppliers a purchase request that omitted the estimated costs, Bakken explained that "I just figured if you were going to get a fair bid, you don't tell everybody what you were willing to pay." J.A. 174. Suppliers would then "pen and ink" their bids in the spaces where the estimated costs had been omitted and return the forms to CSDC. J.A. 181. After CSDC issued an order to a particular

5

supplier, CSDC would submit vouchers for payment to the United States Defense Finance and Accounting Service, an agency of the United States Department of Defense.

Prior to a quarterly review of the Contract scheduled for January 1995, the Army informed CSDC that it was interested in learning how CSDC intended to cope with the surge in work created by various military base closings and a subsequent consolidation at Fort Monmouth. In response, Bendel prepared a presentation, which was reviewed by Luis prior to being delivered by Bendel at the quarterly review. During the presentation, Bendel explained that employees of Comtel, CSDC's subsidiary, could be used to augment CSDC's staff with regard to the wiring of various buildings at Fort Monmouth that were undergoing renovation. Bendel also explained that CSDC would continue to purchase materials in connection with the Contract only after soliciting bids from three suppliers.

Subsequent to this meeting, procedures at CSDC began to change, leading eventually to the charges in this case. In April 1995, Kelly requested that Luis provide him with an experienced individual in the Purchasing Department to assist him in meeting the demands of the Contract. Several days later, Luis, whom Bendel described as an astute businessman who was very familiar with the Federal Acquisition regulations, informed Kelly in the presence of Ary and Jesse that, for purposes of the Contract, Comtel would be used as Kelly's "purchasing arm." J.A. 126. In other words, Kelly explained at trial, "Jesse would place all the purchases for the . . . [Army] contract." J.A. 126. In response, Kelly inquired whether Comtel "would be taking an additional pass-through other than what was given to us in the Contract, which was 10 percent." J.A. 126. When Jesse responded "yes," Kelly reacted in the following manner:

> I said, turned to Luis and I said, I believe this is illegal, I don't think you can do this. And he said why? I said, because you own both companies.

J.A. 126-27. In turn, Luis responded by stating,"okay, go out and get your three quotes. Let COMTEL be one of the people that quotes to you, but in the end give the order to COMTEL." J.A. 127. Jesse subsequently transferred from his position as Director of Purchasing at

6

CSDC to Vice-President and General Manager of Comtel. At that time, Comtel and CSDC had adjoining offices allowing unobstructed access from one to the other. Moreover, Jesse remained on CSDC's payroll.

Andrea Montedoro ("Montedoro"), who assisted the Contracting Officer, testified that Jesse informed her that CSDC was using Comtel to purchase materials in connection with the Contract. Jesse explained that, by using Comtel to purchase materials in connection with various government contracts, CSDC was able to provide quantity discounts to the government. Montedoro testified that she perceived Comtel as nothing more than CSDC's purchasing department for purposes of the Contract:

> Jesse was the head of the Purchasing Department before they became COMTEL. Jesse was head of the Purchasing Department as COMTEL. So, to me it was transparent. It was like a division that was going to handle their purchases.

J.A. 112. Therefore, Montedoro testified, she was under the impression that Comtel, as CSDC's Purchasing Department, was soliciting bids from three suppliers prior to making purchases in connection with the Contract as CSDC had previously done.

Kelly's testimony at trial indicates that he did not initially comply with Luis's directive to issue Comtel all purchase orders pertaining to the Contract. Rather, on certain purchases, Kelly and Bakken continued to solicit bids from three suppliers and to issue orders to the lowest bidder. This led to several situations in which CSDC and Comtel were soliciting bids from the same suppliers with respect to the same purchase request. As Bakken explained at trial,"I would call to get quotes, and someone would say on the phone, well, gee, we just heard from Jesse about this, it sounds like a similar order." J.A. 176. On cross-examination, Luis acknowledged that Comtel was buying from the very same suppliers that CSDC had used before Comtel was established. Luis further acknowledged that Jesse could have performed the same purchasing functions for CSDC as he did for Comtel.

In May 1995, Kelly contacted Agent Timothy Gallagher ("Agent Gallagher") of the Defense Criminal Investigation Service, which

7

conducts criminal investigations on behalf of the Office of the Inspector General for the United States Department of Defense. Kelly told Agent Gallagher that "I was doing something illegal, and I wasn't comfortable with it." J.A. 129. After meeting with Kelly, Agent Gallagher initiated a criminal investigation of the matter with the assistance of Agent Thomas Gribben ("Agent Gribben") of the Naval Criminal Investigative Service.

Kelly's refusal to issue Comtel all orders pertaining to the Contract eventually provoked a reaction from Jesse. According to Kelly's testimony at trial, in July 1995 Jesse "came into my office and slammed the door, with profanity, told me I was holding out on him and he knew it." J.A. 131. On the following day, Luis sent the following e-mail to Kelly and Bakken:

> Please make sure that Jesse gets a copy of the PRs for equipment/material orders for [the Contract] as soon as they come in. Orders should not be issued to other sources unless Jesse agrees to do so. Give him any advance notice you get for anticipated purchases. This also applies to any other major EQUIPMENT/SOFTWARE PURCHASES on any other contracts. Let me know if you have any questions about this.

J.A. 920. Kelly construed Luis's e-mail to mean that "I follow the orders or I get fired." J.A. 132. Bakken left her position with CSDC several months later, explaining at trial that "I was really upset. I figured if not illegal, it was immoral what was going on, and I didn't want to be any part of it." J.A. 176. On cross-examination, Luis acknowledged that Comtel would have access to the estimated costs of materials by virtue of his mandate that Jesse review all purchase requests.

CSDC subsequently hired Jeanna Elliot ("Elliot") to replace Bakken in the Purchasing Department. Elliot testified at trial as to her concerns about the number of orders that CSDC had issued Comtel and the validity of the prices that Comtel had been charging for materials. When Elliot alerted Ary to her concerns about Comtel, Ary instructed her "to just go ahead and process the orders as they stood." J.A. 192. Elliott testified that she "went into some detail about competitive bidding and the things that needed to be done in order to com-

ply with federal regulations and things like that." J.A. 192. Ary's response to her was to "just place the orders as they are." J.A. 192.

Despite Ary's instructions, Elliot decided to solicit bids from various suppliers, including Comtel, in an effort to demonstrate the availability of lower pricing on materials being purchased in connection with the Contract. In so doing, Elliot learned that Comtel tended to have higher prices and longer delivery times than the other suppliers. Elliot also learned from a representative of one of those suppliers that Jesse had instructed him not to bid on any purchase order sent by CSDC without his approval. Elliot eventually left her position with CSDC after having worked there only two months.

Elliot's suspicion concerning the prices that Comtel had been charging CSDC turned out to be well-founded. Debra Noviello ("Noviello"), who served as Jesse's executive assistant at Comtel, testified at trial that the purchase orders that CSDC sent to Comtel contained the typewritten estimated costs. As a consequence, Comtel was made aware of the maximum price that the Army was willing to pay for each set of requested materials. Comtel would then solicit bids from multiple suppliers, select the supplier that offered the lowest bid, and mark up the price using the estimated cost as a guideline. Noviello elaborated as follows:

> [I]t really wasn't a flat percent. It was up until a certain point, and then there was a point where they changed to like a flat 10 percent if I remember correctly. But we definitely just used whatever prices were there as a guideline, and we just marked up accordingly. There wasn't any percentage magic formula. They were just marked up.

J.A. 238-39. To accomplish this Comtel used CSDC's purchase requests to prepare worksheets which would contain three columns of prices: (1) the estimated price of the materials, (2) the price at which Comtel would purchase the materials from an outside supplier; and (3) the price at which Comtel would sell the materials to CSDC, including the mark up. After the billing went from Comtel to CSDC, these worksheets were filed in purchase log books at Comtel.

On October 31, 1995, Agent Gallagher contacted CSDC's office and spoke with Luis. Agent Gallagher testified at trial that he

informed Luis that he was a Special Agent with the Defense Criminal Investigation Service ("DCIS") and that he needed to meet with him. The government offered evidence tending to prove that this phone call precipitated some changes at Comtel and CSDC. Specifically, the government introduced evidence at trial that, between October 15, 1995 and November 2, 1995, two employees, including Jesse, were added to the Comtel payroll. The government also elicited testimony from Luis to the effect that, during the first week of November 1995, a wall was erected between the adjoining offices of CSDC and Comtel, which had previously been unobstructed.

On November 8, 1995, Agents Gallagher and Gribben appeared at CSDC's office and personally served Luis with a subpoena for various documents pertaining to CSDC's purchase of materials in connection with the Contract. According to Agent Gallagher's testimony at trial, Luis explained that CSDC purchased materials only after soliciting three bids from suppliers, and that Comtel was simply one such supplier. Luis further explained that Comtel "received a markup because the transaction between CSDC and COMTEL was an arm's-length transaction." J.A. 215.

Meanwhile, Jesse directed Noviello to replace Comtel's original worksheets with photocopies which omitted the information showing the Army's price ceiling. In performing this task, Noviello explained that she "went to a copier and just made copies of these sheets, just put little pieces of paper over the typed prices, and replaced the original that had the prices with the one that didn't have the prices in the book." J.A. 241. Accordingly, the information regarding price ceilings was effectively blanked out in Comtel's records.

On November 22, 1995, CSDC responded to the government's subpoena. This subpoena had directed the production of nine categories of documents in the custody of CSDC. According to Agent Gallagher, the submissions by CSDC in response to the subpoena could be contained in a small box "about as thick as a Northern Virginia phone book." J.A. 217. In January or February 1996, Agent Thomas Gibson ("Agent Gibson") of the DCIS succeeded Agent Gallagher as the case agent for the investigation of CSDC. Upon reviewing the case file, Agent Gibson determined that CSDC had not produced many of the documents subpoenaed in November 1995. Agents Gib-

son and Gribben subsequently visited CSDC's office and met with Luis, Ary, and Smith. After some discussion, an agreement was reached whereby Agent Gibson would return to CSDC's office in April 1996 to personally review the pertinent documents.

When Agent Gibson returned to CSDC's office in April 1996, he and Ary discussed the nature of the Contract. With regard to purchases of materials, Ary mentioned that "the contract required that they would go and get three quotes" in order to "get the best price for the Government." J.A. 258. Agent Gibson thereafter requested to review an order for a purchase of materials that included three such quotes. Ary did not, however, retrieve such an order for Agent Gibson's review. Rather, Ary merely explained that "there [were] two employees in the CSDC Purchasing Department, Laura Bakken and Norm Kelly, and that they didn't follow instructions, that they didn't get three quotes, and that they would only buy from Computerware." J.A. 259. Her explanation for CSDC's use of Comtel was that it was good business "as it might eliminate a middleman and thereby save the Government money." J.A. 260.

In July 1996, Agent Gibson served subpoenas upon CSDC and Comtel in an effort to obtain the same type of documents sought by the November 1995 subpoena. In response to these subpoenas, the defendants produced to the Inspector General purchase requests which had been altered to conceal two columns of listing price estimates which CSDC had provided to CECOM. After examining the documents that were eventually produced in connection with the July subpoena, Agent Gibson concluded that the July subpoenas had also not been complied with. Agent Gibson eventually approached the United States Attorney's Office and, in June 1997, obtained a subpoena from the federal grand jury mandating that CSDC produce the same type of documents sought by the previous departmental subpoenas. Again, Agent Gibson concluded that CSDC's production did not comply with the subpoena.

Thereafter, Luis was subpoenaed to appear before the grand jury in his capacity as CSDC's custodian of records. Although scheduled to appear on November 12, 1997, Luis did not appear until November 19, 1997. Several months later, in February 1998, CSDC was served with another subpoena from the grand jury. Then, in March 1998,

11

additional subpoenas from the grand jury were served upon CSDC, Comtel, and Luis in his capacity as custodian of Comtel's records.

In June 1998, a set of documents was produced in connection with the foregoing subpoenas which included several Comtel purchase request forms. One such form contained a piece of paper taped over two columns of typewritten prices. This form was similar to one produced earlier by the defendants which did not reflect the Army's price limits but on which the outline of the covering over the two columns of prices could be seen. Agent Gibson testified as to his belief that this particular document would have been responsive to the original subpoena that was served upon CSDC in November 1995. A comparison of the two documents produced strong evidence that the original submission had been purposely altered to hide the fact that the pricing limits had been disclosed to Comtel. This view was substantiated by the testimony of Noviello who was told to make such copies.

Robert Silverstein ("Silverstein"), an auditor in the Inspector General's office, reviewed documents produced by CSDC "to determine the amount of money, costs that were incurred from CSDC, from COMTEL to CSDC versus the amount of costs from the vendor invoices to COMTEL." J.A. 285. Silverstein eventually identified numerous transactions in which Comtel purchased materials from an outside supplier at a particular price and then sold those same materials to CSDC at a higher price. In one such transaction that the government highlighted at trial, Comtel purchased materials from a supplier for $77,806.38 and then sold those materials to CSDC for $104,264.72, resulting in a mark up of 34 percent. Silverstein concluded that the total amount of overcharges to the Army was $506,799.52.

II.

On appeal, the defendants pose challenges to the district court's decision to give the jury a "willful blindness" instruction, to the sufficiency of the evidence at trial supporting their convictions under 18 U.S.C.A. § 1505, and to certain statements that the government made to the jury during summation. Moreover, Ary challenges the calculation of her sentence, arguing that she was entitled to a reduction of her offense level because she had a mitigating role in the offenses.

12

The government cross-appeals from the defendants' sentences, however, contending that the district court erroneously calculated the amount of loss sustained by the Army as a result of the defendants' offenses.

A.

First, the defendants challenge the district court's decision to instruct the jury that "a defendant's knowledge of a particular fact may be inferred from a deliberate or an intentional ignorance or deliberate or intentional blindness to the existence of that fact." J.A. 730. Such an instruction, which is commonly known as a "willful blindness" instruction, is appropriate "when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." United States v. Ruhe, No. 98-4731, 1999 WL 674758, at *5 (4th Cir. August 31, 1999) (internal quotation marks omitted). We conclude that the district court's decision to give the "willful blindness" instruction, which we review for an abuse of discretion, see id., was proper. As we previously discussed in detail, the government's evidence was that Luis was put on notice by subordinates about the probable illegality of the Comtel purchasing scheme; Luis, however, testified that he was not told the plan was illegal, that he did not suspect that such a scheme was illegal, and that he depended on Kelly, the CSDC employee who was familiar with the applicable regulations. If the jury believed Luis was warned by Kelly, Luis clearly made no effort to learn whether Comtel's involvement was, in fact, illegal. Likewise, the government presented evidence that Ary, who supervised accounting and invoicing, attended a meeting during which Kelly told Luis that the scheme was illegal and, on another occasion, was herself told by Elliott that the use of Comtel in the purchasing process was not in compliance with the regulations. In light of the record, the district court's decision to charge willful blindness was perfectly appropriate.

We also reject the defendants' argument to the extent it challenges the substance of the instruction. Specifically, the defendants suggest that the court's instruction misled the jury into believing that the government did not need to establish specific intent to defraud on the part of the defendants, i.e., that all the government needed to prove was that the defendants should have known their conduct was illegal. We

13

disagree. The court's jury instructions must be viewed in their entirety and, as a whole, the jury instructions were not misleading. The district court charged each element of each crime and instructed the jury that the government bore the burden of establishing each element beyond a reasonable doubt. We are satisfied that the district court did not abuse its discretion in deciding to give the jury a"willful blindness" instruction, and that the jury was properly charged.

B.

The defendants next challenge their convictions for obstruction based on the alteration of the purchase orders produced pursuant to the subpoenas. See 18 U.S.C.A. § 1505. First, they claim the evidence at trial was insufficient to support their convictions. Second, they contend the district court improperly permitted evidence of other acts of obstruction, which inevitably resulted in the convictions.

1.

The district court charged the jury that the government had to establish three elements beyond a reasonable doubt in order to convict defendants of violating section 1505: (1) that "a proceeding was pending before an agency of the United States"; (2) "that the defendant knew that a proceeding was pending before an agency of the United States," i.e., that "the defendant knew that on or about November, 1995 through May, 1996 that a criminal investigation was being conducted by the Department of Defense"; and (3) "that the defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law under which the proceeding was being conducted." J.A. 724. The district court defined "corruptly" as "having the improper motive or purpose of obstructing justice." J.A. 726. Defendants did not object to the content of the court's instruction, and they do not challenge its substance on appeal.

The defendants believe the evidence was insufficient to support a conviction for obstruction because the only witness who testified about the alteration of the purchase orders claimed that Jesse Hernandez -- not the defendants -- directed her to obscure the estimated equipment costs on the documents to be produced pursuant to the subpoenas. Defendants also highlight Luis's testimony that he did not

14

examine the documents before they were turned over to the government. There is simply no evidence, they maintain, to suggest that the defendants knowingly or purposely altered the documents.

In response, the government stresses that the record contains sufficient evidence that, although circumstantial in nature, supports the obstruction convictions for each of the defendants. CSDC's chief operating officer testified that Ary Hernandez was principally responsible for CSDC's compliance with the subpoenas and Luis testified that he shared responsibility. Prior to producing the documents, Luis and Ary had the documents stored at CSDC's facility. And, of course, it is undisputed that the documents eventually produced by Ary contained purchase orders that had been altered. Therefore, the altered documents were in the defendants' possession and were produced by the defendants. These facts are compelling when coupled with the nature of the criminal endeavor being committed by a husband and wife (and the husband's brother) in business together as principals in the operation, and the obvious utility to everyone in the conspiracy of concealing the information involved.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the government to determine whether a reasonable factfinder could find the defendants guilty of the offense beyond a reasonable doubt. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). Viewed in the light most favorable to the government, this evidence was sufficient to permit a rational trier of fact to draw the inference that defendants knowingly endeavored to obstruct the investigation.

2.

Additionally, the government contends that the evidence is sufficient to sustain the defendants' convictions on this count pursuant to Pinkerton v. United States, 328 U.S. 640 (1946). Pinkerton established "that where substantive offenses have been committed by a coconspirator in furtherance of a proven conspiracy, fellow conspirators can be found guilty on that basis of the substantive offenses." United States v. Chorman, 910 F.2d 102, 110 (4th Cir. 1990). Under a Pinkerton theory, the government contends there was direct evi-

15

dence that Jesse ordered the alteration of the purchase order documents, which were an integral part of the scheme to defraud the Army. The jury could reasonably conclude from the evidence that Jesse was a co-conspirator in the scheme to defraud the government and that he ordered Noviello to obscure the prices on the purchase orders to conceal the conspiracy.

The defendants, on the other hand, claim that Pinkerton does not apply here because the conspiracy and the substantive obstruction count are too attenuated. We disagree. The government's theory at trial was that CSDC was using Comtel to unlawfully inflate the cost of materials and equipment to be reimbursed by the government. Indisputably, a key piece of evidence to support this theory was CSDC's use of purchase orders to pass along to Comtel information to enable Comtel to inflate the cost as much as possible. Rather than attenuated, this evidence is directly connected to the conspiracy, and, we believe, it is certainly foreseeable that in these particular circumstances, a co-conspirator would attempt to conceal the conspiracy by altering the documents.

3.

Finally, the defendants argue that their conviction for obstruction should be reversed because the district court allowed the introduction of obstructive behavior by the defendants in addition to their redaction of the documents produced in response to the subpoenas. The defendants were charged with falsifying documents produced in response to the departmental subpoenas served in November 1995 and July 1996, which were issued by the Inspector General. On direct examination, Agent Gibson testified that after the defendants failed to comply with the subpoenas served by the Inspector General in July 1996, he obtained a grand jury subpoena that requested essentially the same documents as the previous subpoenas. In particular, the defendants object both to Agent Gibson's testimony that the defendants did not immediately comply with the grand jury subpoenas and to evidence suggesting that Ary Hernandez refused to cooperate with agents.[2]

_____

**2** At trial, the defendants did not object to the testimony regarding Ary's failure to cooperate fully. Accordingly, to the extent Ary objects to the admission of this specific testimony, we review it only for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993). Clearly, the district court committed no plain error here.

16

The defendants contend that evidence of obstructive conduct other than the alteration of documents in response to the Inspector General's subpoenas is evidence of "other crimes, wrongs, or acts" offered to establish consciousness of guilt and must therefore comply with Rule 404(b) of the Federal Rules of Evidence. See United States v. Hayden, 85 F.3d 153, 159 (4th Cir. 1996). Rule 404(b) permits the introduction of such evidence, as long as the government "provide[s] reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed. R. Evid. 404(b). Because the government did not provide adequate notice under the rule, the defendants argue that the evidence of other obstructive behavior was inadmissible. Moreover, the defendants assert that the government's closing argument highlighted this evidence in support of the obstruction charge, necessarily leading the jury to convict based on this evidence.

We disagree that the evidence in question was 404(b) evidence. The government introduced evidence of the defendants' failure to immediately comply with the grand jury subpoenas as evidence of their participation in the conspiracy -- that they were aware of their wrongdoing in connection with the conspiracy -- not that the defendants had committed other acts of obstruction. The district court did not abuse its discretion in admitting this evidence. See United States v. Dozie, 27 F.3d 95, 97 (4th Cir. 1994).

C.

The defendants claim that certain statements that the government made to the jury during summation warrant reversal of their convictions. Specifically, the government argued to the jury:

> If the Hernandez[es] and CSDC had done what they were supposed to do, they would have gotten the best price for the government and not for themselves. The Hernandez[es] are lying, they're lying to you when they say they didn't understand what was going on and that they didn't understand what they were doing. They understood they were supposed to get the best advantageous price for the government and they didn't do it. They understood that they were making

17

money with Comtel. They understood that they were stealing from the government and they understood that because there was no other reason to use Comtel.

J.A. 636-37 (emphasis added).

At the conclusion of the government's summation, counsel for Ary moved for a mistrial. In support of the motion, counsel contended that Ary did not testify at trial and thus the government's statement that "[t]he Hernandez[es] are lying, they're lying to you" adversely implicated Ary's Fifth Amendment right not to testify. No other basis was offered for the motion. Counsel for Ary further suggested that "the government ought to stand up there and acknowledge that any reference to lying referred only to Mr. Hernandez." J.A. 639. The district court refused to grant a mistrial, but indicated that it would be appropriate for the prosecutor to explain to the jury that her comments were directed at Luis. The government then made the following statement to the jury:

> Ladies and gentlemen, there is one additional thing I would like to say in reference to the Hernandez[es]-- Luis Hernandez was the only one that testified in court.

J.A. 640. The defendants did not object to this comment by the government.

On appeal, Ary argues that her Fifth Amendment rights were abridged by the prosecutor's initial comment and that her attempt to clarify that the comment was directed at Luis only compounded the error by emphasizing that Ary did not testify. The government's initial comment that the "Hernandez[es] are lying, they're lying to you" runs afoul of the Fifth Amendment if "the language used [was] manifestly intended to be, or was . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996). Although we have castigated prosecutors in the past for making similar remarks, we cannot perceive how such a remark amounts to an intentional comment on Ary's failure to testify in contravention of the Fifth Amendment.

18

As for the government's attempt to clarify the remark, which purportedly compounded the error, Ary was apparently satisfied because she did not object to it. Accordingly, to the extent that Ary takes exception to the final remark by the prosecution-- that only Luis testified -- we review it for plain error. See Olano, 507 U.S. at 731-32. Under this standard of review, even if an error has occurred, and it is a plain one, we will not reverse unless the error affects Ary's substantial rights, see id. at 734, i.e., unless the error affects the outcome of the case, see United States v. David, 83 F.3d 638, 647 (4th Cir. 1996). We conclude that this comment did not affect the outcome of the case, in light of the evidence in its entirety and the district court's admonishment to the jurors that they not consider whether a defendant testified. Furthermore, we will not exercise our discretion to reverse a plain error unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (alteration in original) (internal quotation marks omitted). This is not such an error.

With respect to Luis, we note that the basis offered for the objection and motion for a mistrial derived only from the Fifth Amendment. However, Luis testified and thus the Fifth Amendment grounds for appeal do not apply to him. Therefore, to the extent that Luis appeals the district court's refusal to grant a mistrial, it is because he was labeled a liar by the prosecutor. Of course, no one objected at trial to the use of this term -- only its application to Ary. Again, our review is for plain error. And, for the reasons stated above, we are satisfied that the district court did not commit a plain error requiring reversal with respect to Luis. See United States v. Moore, 11 F.3d 475, 481-82 (4th Cir. 1993).

D.

The Presentence Investigation Report prepared by the United States Probation Office in connection with Ary's convictions calculated an offense level of 16 and a criminal history category of I, resulting in an imprisonment range of 21 to 27 months. The district court adopted the preceding calculations and ultimately sentenced Ary to a 21-month term of imprisonment. In so doing, the district court rejected Ary's contention that she was entitled to a reduction of her offense level under U.S.S.G. § 3B1.2, which mandates such a reduction when

19

a defendant had a mitigating role in an offense. We review a district court's determination under section 3B1.2 for clear error. See United States v. Terry, 86 F.3d 353, 358 (4th Cir. 1996).

We cannot conclude that the district court clearly erred here. Although Ary argues that her role in the offense of conviction was a minimal one, the record supports the district court's conclusion to the contrary. Ary acted in a supervisory capacity over CSDC's purchasing department; she oversaw the submission of claims for payment to the government; she issued Comtel's checks for the purchase of materials in connection with the scheme; she was present when Kelley told Luis that he harbored doubts about the legality of their use of Comtel in performing the Contract; even after a question was raised, she directed Jeanna Elliot to continue sending purchase requests to Comtel without the benefit of competitive pricing; and she was primarily responsible for the production of documents pursuant to the departmental subpoena. In view of the considerable evidence in the record of Ary's involvement in the scheme to defraud the government, we do not believe the district court committed clear error in its refusal to grant a reduction of her offense level.

III.

The government cross-appeals the district court's calculation of $100,286 as the amount of loss for sentencing purposes under U.S.S.G. § 2F1.1(b)(1), which prescribes incremental sentence enhancements based on the amount of loss caused by the fraud. We review the district court's factual determination of the amount of loss for clear error, see United States v. Brooks, 111 F.3d 365, 374 (4th Cir. 1997), but our review of the court's legal interpretation of "loss" under U.S.S.G. § 2F1.1(b)(1) is de novo, see United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995). The district court adopted the calculation for the amount of loss included in the presentence report, rejecting the government's figure of $506,000. The government arrived at this amount based on the testimony of auditor Steven Silverstein, who first determined the actual purchase costs and then added a ten percent markup for CSDC, which was appropriate under the Contract. Silverstein then subtracted this amount from the actual amount billed to the Army to reach the total loss amount.

20

The district court concluded that the proper measure of the amount of loss was the profit realized by Comtel -- not CSDC. In this regard, the district court endorsed the presentence report, which explained that the use of a subsidiary such as Comtel is permissible and that such subsidiaries may pass along certain costs to the government. According to the presentence report, the problem with the government's proposed loss calculation was that it did not allow for indirect and G&A costs that were permissible under the regulations: "[The Federal Acquisition Regulations] permit a wholly-owned subsidiary to increase the cost on the sale of material to its parent by an amount equal to the cost of doing business to the subsidiary. It is not disputed that [the regulations] . . . prohibit the charging of a profit on the sale of materials from the subsidiary to the parent company." J.A. 1100. The presentence report concluded that Comtel's financial records reflected a total profit of $100,286 from sales to CSDC, and the district court adopted this figure as the amount of loss.

On appeal, the government argues that the district court's decision to link the amount of loss to the profit realized by Comtel was clearly erroneous. The government argues that because the Contract required CSDC to obtain the most advantageous price, and then bill the Army only the actual cost plus ten percent, the loss should be the difference between actual cost plus ten percent and the amount the Army was ultimately billed.

We agree that simply determining how much profit Comtel made is clearly an inappropriate method of calculating loss. Such a determination rises and falls on a defendant's efficiency or business acumen. That is, a defendant could decrease his sentencing exposure by inflating the cost of doing business, intentionally or not. In either case, profits are reduced and the amount of loss for sentencing purposes is limited accordingly.

The Sentencing Guidelines define "loss" as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, comment. (n.7). In cases involving fraudulent contract procurement, "[p]ayment fraudulently obtained in excess of the amount to which a defendant is legally entitled is a taking of property under the Guidelines, and thus is a proper measure of the amount of loss for sentencing purposes." Castner, 50 F.3d at 1276 (internal quotation marks

21

omitted). Here, the Contract required CSDC to obtain the most advantageous price for the Army. CSDC was then entitled to reimbursement for the actual cost, plus ten percent. To the extent CSDC invoiced the Army for any amount above actual cost plus ten percent, it obtained an amount in excess of that to which it was entitled.

We recognize, however, that the Federal Acquisition Regulations permit the use of a subsidiary and that certain costs associated with doing business can be passed along to the government. See 48 C.F.R. § 31.205-26 (1998). These costs must be "allowable" before they can be passed along to the government. See 48 C.F.R. § 31.201-2 (1998). In deciding that "profit" was the proper measure of loss, the district court failed to determine which costs were allowable and could be passed along to the government under the regulations. The calculation adopted by the district court assumes that all of Comtel's operating expenses were legitimate, reasonable, and allowable costs. Yet, in rendering its verdict, the jury necessarily found that Comtel was essentially a subterfuge employed by CSDC to fraudulently inflate material costs. The operation of Comtel was an integral part of the criminal enterprise, and, as a result, we do not believe that Comtel's profits are necessarily an accurate reflection of the government's loss here.

Recognizing, however, that certain costs associated with performing the contract might properly have been passed along to the Army, we remand for the district court to determine the amount of loss in light of this opinion. During resentencing, of course, the government bears the burden of proving the amount of loss by the preponderance of the evidence. See United States v. Davis, 184 F.3d 366, 368 (4th Cir. 1999).

IV.

In summary, we conclude that the defendants' challenges to their convictions and sentences are without merit, but that the district court improperly determined the amount of loss sustained by the Army for

22

purposes of sentencing. Accordingly, we affirm the defendants' convictions, but vacate their sentences and remand for resentencing.

<u>AFFIRMED IN PART, VACATED IN PART,</u>
<u>AND REMANDED</u>

23